**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2970
_____

CHILDREN'S HEALTH DEFENSE, INC.; PETER CORDI;
RAELYNNE MILLER; KAYLA MATEO;
ADRIANA PINTO; JAKE BOTHE; ANTHONY
LAMANCUSA; JESSICA MOORE;
RYAN SANDOR; GIANNA CORALLO;
RYAN FARRELL; SEBASTIAN BLASI;
MAGGIE HORN; LINDSAY MANCINI,
Appellants

v.

RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY;
BOARD OF GOVERNORS;
RUTGERS SCHOOL OF BIOMEDICAL
AND HEALTH SCIENCES;
CHANCELLOR BRIAN L. STROM;
PRESIDENT JONATHAN HOLLOWAY, in their official
capacities
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-21-cv-15333)
District Judge:  Honorable Zahid N. Quraishi

_____

Argued June 27, 2023

Before: JORDAN, KRAUSE, and MONTGOMERY-REEVES, *Circuit Judges.*

(Filed: February 15, 2024)

Ray L. Flores
Law Offices of Ray L. Flores
11622 El Camino Real
San Diego, CA 92130

Julio C. Gomez        [**ARGUED**]
Gomez LLC
1451 Cooper Road
Scotch Plains, NJ 07023

Mary S. Holland
Children's Health Defense
852 Franklin Avenue
Franklin Lakes, NJ 07417

Robert F. Kennedy, Jr.
Kennedy & Madonna
48 Dewitt Mills Road
Hurley, NY 12443
        *Counsel for Appellants*

Jeffrey S. Jacobson     [**ARGUED**]
Faegre Drinker Biddle & Reath
1177 Avenue of the Americas

2

41st Floor
New York, NY 10036

Andrew B. Joseph
Faegre Drinker Biddle & Reath
One Logan Square
Suite 2000
Philadelphia, PA 19103

William J. Latimore
Faegre Drinker Biddle & Reath
600 Campus Drive
Florham Park, NJ 07932
    *Counsel for Appellees*

_____

## OPINION OF THE COURT
_____

**KRAUSE**, *Circuit Judge*.

The core educational mission of a university presupposes a safe and healthy student body to educate. For that reason, a university's responsibilities necessarily extend beyond the curriculum to the significant challenge, even in normal times, of safeguarding its population. Of course, the past few years have been anything but normal. The challenges posed by the COVID-19 pandemic were unprecedented, and universities around the country, indeed, around the world, had to wrestle with hard choices like whether to mask, to require vaccination, to "go remote," or to "go hybrid." They also faced hard choices in the sequencing of such safety measures across different components of the university as they attempted, in novel and fast-changing circumstances, to resume in-person

3

classes and target the spread of the virus among those most at risk for "super spreader" transmission.

In preparing for a safe return to campus in the fall of 2021, Appellee, Rutgers University, took a phased approach that, in the first instance, prioritized the health of the student body. That spring, as the prior school year came to a close, Rutgers announced that student vaccination would be a condition of attending fall classes in person or having physical access to campus resources. At the same time, it provided students the options to decline vaccination for medical or religious reasons, to become a fully remote student, or to disenroll and attend a different university. Within a few months, it extended that in-person vaccination requirement to its health care and public safety personnel, and a few months after that, to all in-person faculty and staff.

Appellants include thirteen Rutgers University students who took issue with the student policy. Along with Appellant Children's Health Defense, Inc.,[1] these students filed suit against Rutgers, raising various constitutional and statutory

---

[1] Children's Health Defense, Inc. ("CHD") identifies itself as an organization that seeks to "end childhood health epidemics by working aggressively to eliminate harmful exposures, [to] hold those responsible accountable, and to establish safeguards." JA 160. For ease of reference and because CHD brought suit on behalf of the student plaintiffs, we will refer to the appellants, collectively, as "the Students" or "Appellants." Likewise, we will refer to Appellees Rutgers, the Board of Governors, Rutgers School of Biomedical and Health Sciences, Chancellor Brian Strom, and President Jonathan Holloway, in their official capacities, as "Rutgers."

claims. Although vaccination was one among the other options for matriculating and was required only for in-person attendance, Appellants' complaint pejoratively labelled the policy a "vaccine mandate" and sought general damages as well as declaratory and injunctive relief. The District Court dismissed all claims as either moot or failing to state a claim.

We will affirm the District Court's judgment because, even accepting the complaint's factual allegations as true, as we must at this stage, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Students have not stated any plausible claim for relief. We reach this conclusion based on the application of well-settled law and in line with every other federal court to have considered similar challenges.[2]

## I.    **Factual and Procedural Background**

The essential contours of the COVID-19 pandemic are well-known. The first wave of cases came to the United States in early March 2020, and by mid-to-late March, several states had in place emergency orders closing non-essential businesses

---

[2] *See, e.g.*, *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592 (7th Cir. 2021); *Norris v. Stanley*, 73 F.4th 431 (6th Cir. 2023); *Kheriaty v. Regents of the Univ. of Cal.*, No. 22-55001, 2022 WL 17175070 (9th Cir. Nov. 23, 2022); *Harris v. Univ. of Mass., Lowell*, 557 F. Supp. 3d 304 (D. Mass. 2021), *appeal dismissed*, 43 F.4th 187 (1st Cir. 2022); *Messina v. Coll. of N.J.*, 566 F. Supp. 3d 236 (D.N.J. 2021); *Pavlock v. Perman*, No. RDB-21-2376, 2022 WL 3975177 (D. Md. Sept. 1, 2022); *George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Governors*, No. 22-cv-0424-BAS-DDL, 2022 WL 16722357 (S.D. Cal. Nov. 4, 2022).

and limiting large gatherings.[3]  New Jersey was one of them: On March 21, 2020, Governor Murphy issued Executive Order No. 107, which directed "[a]ll New Jersey residents [to] remain at home" except for certain exigencies.  JA 284.  The order closed most businesses, cancelled social gatherings, and required "[a]ll institutions of higher education," including Rutgers, to "cease in-person instruction."  *Id.*  But New Jersey, like most of the country, began a slow return to normalcy in spring 2021, when two, then three, COVID-19 vaccines received emergency use authorization and were made available to the public.[4]

---

[3] *2020–2021 Executive Orders*, The Council of State Gov'ts, https://web.csg.org/covid19/executive-orders/ (last visited December 19, 2023).  Where we rely on information beyond what the parties included in their filings, "that information is publicly available on government websites and therefore we take judicial notice of it."  *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 705 n.5 (3d Cir. 2004) (same).  This includes materials available on the website of Rutgers, which, as an instrumentality of the State of New Jersey for regulatory purposes, *see San Filippo v. Bongiovanni*, 961 F.2d 1125, 1134 n.12 (3d Cir. 1992); *Fine v. Rutgers*, 750 A.2d 68, 71-72 (N.J. 2000), is subject to public records laws, *see Sussex Commons Assocs., LLC v. Rutgers*, 46 A.3d 536, 544 (N.J. 2012); N.J.S.A. 47:1A-1.1 (defining "Government record" and "Public agency").

[4] *Emergency Use Authorization–Archived Information*, Food and Drug Administration, https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-

6

One year into the pandemic, Rutgers announced that it would resume in-person learning for the fall 2021 semester, and on April 13, 2021, it issued the first iteration of its COVID-19 vaccination policy (the "Policy").[5]  Consistent with Rutgers' decision to prioritize student health, the initial goal of the Policy was "[t]o minimize outbreaks of COVID-19 among students,"[6] and by the fall, Rutgers had expanded that goal "[t]o minimize outbreaks of COVID-19 in the Rutgers University community" at large.  JA 350.  Thus, the April 2021 Policy required students, as a condition of in-person campus access, to be vaccinated before the start of the new school year.  Two months later, in June 2021, Rutgers extended the Policy to "health care personnel and all Rutgers University public safety personnel at all locations,"[7] and by October 2021, tracking

---

framework/emergency-use-authorization-archived-information#H1N1 (last updated December 15, 2023).

[5] Interim COVID-19 Immunization Record Requirement for Students at 1, Children's Health Defense, Inc. et al v. Rutgers et al, 3:21-cv-15333-ZNQ-TJB (Aug. 30, 2021), ECF No. 10-3, (hereinafter "ECF No. 10-3").  In full, the "Reason for Policy" in April 2021 read: "[t]o minimize outbreaks of COVID-19 among students; to prevent or reduce the risk of transmission of COVID-19 among all persons at Rutgers University and Rutgers-affiliated health care units; and to promote the public health of the community consistent with federal, State, and local efforts to stem the pandemic."

[6] *Id.*

[7] Antonio M. Calcado, *Guide to Returning to Rutgers– Update 7/28/21*, Rutgers (July 28, 2021), https://coronavirus.rutgers.edu/guide-to-returning-to-rutgers-

President Biden's Executive Order,[8] it had expanded the in-person vaccine requirement to the remainder of its population, *i.e.*, all staff and faculty.[9]

The student policy included three exemptions: (1) students enrolled in fully online degree-granting programs;[10] (2) students with a documented medical contraindication to the COVID-19 vaccination; and (3) students with a conflicting *bona fide* religious belief or practice.[11]  Exempt students, however, were subject to certain restrictions, including that they were excluded from university housing, required to test

update-7-28-21/; *Section 100.3.1, Immunization Policy for Covered Individuals,* Rutgers (Jun. 21, 2021), https://web.archive.org/web/20210628160715/https://policies. rutgers.edu/sites/default/files/100-3-1-current.pdf.

[8] *See* Antonio M. Calcado, *President Biden's Executive Order Requiring Coronavirus Vaccines*, Rutgers (Oct. 25, 2021), https://coronavirus.rutgers.edu/president-bidens-executive-order-requiring-coronavirus-vaccines/.

[9] *Id.*

[10] The Policy specified: "Students enrolled in those programs generally do not receive Rutgers student identification, are not given access to Rutgers campus resources, and are not expected to have any physical presence on campus during the course of their pursuit of a Rutgers degree."  JA 351.  In contrast, "[m]atriculated students who select courses denoted as 'remote,' but who are not enrolled in a fully online degree-granting program, are not exempt."  *Id.*

[11] Per the Policy, "[a] general philosophical or moral objection to immunization shall not suffice[.]"  JA 352.

8

weekly, and in addition to the indoor mask requirement, required to mask in congregate settings.[12] As the Policy was informally announced in March 2021, students had approximately six months to seek exemptions on health or religious grounds, take classes at a different university, change their status at Rutgers to fully remote,[13] or, for students who required a particular in-person-only course to graduate, to take that class over the summer before the Policy came into effect.

Appellants objected to the Policy and filed a complaint against Rutgers in the District of New Jersey in August 2021.[14] Twelve of the thirteen Students had applied for and received medical or religious exemptions. JA 165. The remaining student, Adriana Pinto, also "struggled with her health" but opted not to seek a medical exemption. JA 138. While one of the remaining classes that Pinto needed to graduate allegedly was an in-person-only course, she opted not to take it over the summer before the vaccine requirement became effective and instead became a plaintiff in this action.[15] *See* JA 139-40.

---

[12] The masking requirements have since been lifted.

[13] As set forth above, students enrolled in one of Rutgers' online degree-granting programs had no access to Rutgers' campuses and were, therefore, considered to be "fully remote." *See supra* note 10. A student enrolled in the regular program, in contrast, retained access to campus even if that student's professors opted to hold their classes remotely.

[14] The Operative Complaint ("the Complaint") is the First Amended Complaint, filed on October 19, 2021.

[15] *See also* JA 95; Decl. of Adriana Pinto, Children's Health Defense, Inc. v. Rutgers et al, 3:21-cv-15333-ZNQ-TJB (Sep. 20, 2021), ECF No. 24-11 at 2.

The Students' Complaint broadly alleged that "[a]ll available vaccines in the United States are emergency-authorized COVID-19 vaccines made by Pfizer, Moderna and Johnson & Johnson. They are not FDA approved, and are not proven safe and effective." JA 194. It also alleged: "Rutgers has been involved in the clinical trials for all three COVID vaccines—those of Pfizer, Moderna, and Johnson & Johnson," and, although it does not explain how, it asserts Rutgers "will gain financially from universal mandates for the vaccines it has helped to develop." JA 157. The upshot, according to the Complaint, was that:

> As a result of its financial ties to COVID-19 vaccine manufacturers, its involvement in clinical trials for all of the currently available COVID-19 vaccines, and its stake in the approval and widespread dissemination and use of COVID-19 vaccines, [Rutgers is] conflicted from making any objective decision or imposing any mandate concerning the administration of COVID-19 vaccines upon its students.

JA 206. Based on these allegations, the Complaint asserted seven claims, three of which have been abandoned on appeal.[16] The four remaining claims, for which the Students sought damages as well as injunctive relief,[17] are: (1) preemption

---

[16] The abandoned claims are for violations of the First Amendment's Free Exercise Clause, breach of contract, and promissory estoppel.

[17] Although the pandemic has largely subsided, rendering claims for injunctive relief moot in a number of

under the federal Emergency Use Authorization ("EUA") statute, 21 U.S.C. § 360bbb-3; (2) lack of authorization under New Jersey law; (3) violation of substantive due process under the Fourteenth Amendment; and (4) violation of equal protection under the Fourteenth Amendment for the unequal treatment of (a) staff and students, as only the latter were initially required to vaccinate; and (b) vaccinated and unvaccinated students (including unvaccinated students with "natural immunity" from having had COVID-19).

The District Court granted Rutgers' motion to dismiss, brought under Federal Rule of Civil Procedure 12(b)(6), concluding that none of the claims pleaded stated a viable cause of action. At the outset, the District Court found that all Students, other than Pinto and CHD, lacked standing and that their claims were moot, because they were exempt from Rutgers' vaccine requirement. It then considered the Students' constitutional claims, first recognizing that the Supreme Court's seminal decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) permitted a state to require its residents to be vaccinated, even without exemptions, if a rational basis exists to determine that such a step is necessary to mitigate a public health emergency. Because the District Court found Rutgers "undoubtedly has a legitimate interest" in enforcing its Policy to curb the spread of the COVID-19 pandemic, JA 18, it

COVID-19 related appeals, *see, e.g.*, *Sczesny v. Murphy*, No. 22-2230, 2023 WL 4402426, at *1 (3d Cir. June 14, 2023); *Clark v. Governor of N.J.*, 53 F.4th 769, 781 (3d Cir. 2022); *County of Butler v. Governor of Pa.*, 8 F.4th 226, 232 (3d Cir. 2021), the Students' request for damages in this case ensures that we have a live controversy, *see Bd. of Pardons v. Allen*, 482 U.S. 369, 370 n.1 (1987).

dismissed the Students' substantive due process and equal protection claims. And because Rutgers had required staff to be vaccinated a few months after it imposed that requirement on students, the District Court dismissed as moot their equal protection claim concerning the disparate treatment of students and staff.

As to the Students' preemption claim, the District Court rejected the argument that federal law preempted Rutgers' Policy, in part because "Rutgers has not mandated any medical products" in violation of 21 U.S.C. § 360bbb-3, but rather "has simply made adherence to the mandate a condition to [] enrollment at the university." JA 26. Finally, the District Court concluded that Rutgers' Policy was not *ultra vires* under state law because the university was authorized to require COVID-19 vaccinations under N.J.S.A. § 18A:61D-1 and N.J. Admin. Code § 8:57-6.4(c), and to exclude exempted students from university housing under N.J. Admin. Code §§ 8:57-6.14(d), 6.15(c).

## II.     **Jurisdiction and Standard of Review**

The District Court had jurisdiction over the Students' federal claims under 28 U.S.C. § 1331 and related state law claims under 28 U.S.C. § 1367(a). We have appellate jurisdiction under 28 U.S.C. § 1291.

We review a district court's ruling on a motion to dismiss *de novo. Doe v. Univ. of the Scis.*, 961 F.3d 203, 208 (3d Cir. 2020). In conducting that review, we construe the complaint in the light most favorable to the plaintiff, accept all "well-pleaded factual allegations" as true, and examine whether the complaint contains "sufficient factual matter,

12

accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678-79 (internal quotation omitted). We need not accept as true legal conclusions or unwarranted factual inferences. *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 133 (3d Cir. 2006) (citation omitted).

## III. <u>Discussion</u>

Because Article III standing is a prerequisite for our jurisdiction, we will address the question of the exempt Students' standing before turning to the merits of the Students' four claims.

### A. <u>Standing</u>

Article III of the Constitution requires that a plaintiff establish standing to sue in federal court. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). A plaintiff meets that burden by showing "(i) that [the plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citation omitted). When multiple plaintiffs sue, at least one plaintiff must have standing to assert each claim. *Horne v. Flores*, 557 U.S. 433, 445 (2009) (citations omitted).

Here, it is beyond dispute that at least two of the Appellants have standing to challenge Rutgers' vaccine requirement: (1) Adriana Pinto, the Rutgers student who did not request or receive an exemption—and who, per Rutgers' Policy, has been disenrolled from her classes; and (2) CHD itself, whose standing mirrors that of Pinto (a member).

13

It is a closer question whether the exempt students have standing to challenge Rutgers' exclusion of unvaccinated students from university housing and other exemption conditions. If we read the Students' Complaint to allege no injury beyond "their fear of future potential harm," we might agree that they have not suffered any actual or imminent injury. JA 15. But other aspects of the Complaint can be read to allege more concrete injuries fairly traceable to Rutgers' Policy, like the loss of student housing, which could be redressed by a decision in the Students' favor. *See* JA 232 (alleging that denial of university housing is a condition of exemptions, which can further subject students to "loss of scholarships, Honors Program enrollments, athletics"); 173-74 (alleging that "Doe 9 is incurring additional cost and expense to reside off-campus as a result of Defendants' actions"); 176 (same for Doe 13).[18] Thus, we conclude that even the exempt students have standing, and we may consider all of the Students' claims.

B.    Appellants' Claims

Proceeding to the merits, we address below the Students' four claims on appeal.

---

[18] The concepts of standing and mootness are "closely related" because both deal with the Court's ability to provide redress. Because the exempt students here have a legally cognizable interest in the outcome, and we could grant them "effectual relief," their claims are not moot. *Calderon v. Moore*, 518 U.S. 149, 150 (1996).

14

1. Federal Preemption[19]

The Students first contend that Rutgers' Policy conflicts with "[t]he principle that it is illegal to coerce an individual to accept an experimental medical product," grounded in federal law governing EUA products, namely 21 U.S.C. § 360bbb-3, which requires "that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product." Opening Br. 55, 57. But the District Court correctly dismissed this claim for two reasons.

First, § 360bbb-3(e)(1)(A) obligates only the Secretary of Health and Human Services to act, by establishing "conditions designed to ensure" informed consent.[20] Because

---

[19] We assume for purposes of the appeal that the Students have a private cause of action under § 360-bbb. Rutgers does not contend otherwise, and the District Court did not consider the issue. *But see Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 817 (1986) (holding that private actors have no federal cause of action for a violation of the Federal Drug and Cosmetic Act); *Bridges v. Houston Methodist Hosp.*, 543 F. Supp. 3d 525, 527 (S.D. Tex. 2021) (holding that § 360-bbb "does not confer a private opportunity to sue the government, employer, or worker"), *aff'd sub nom. Bridges v. Methodist Hosp.,* No. 21-20311, 2022 WL 2116213 (5th Cir. June 13, 2022); *Crosby v. Austin*, No. 8:21-cv-2730, 2022 WL 603784, at *1 (M.D. Fla. March 1, 2022) (no right of action under 21 U.S.C. § 360bbb-3); *Norris v. Stanley*, No. 1:21-cv-756, 2022 WL 247507, at *5 (W.D. Mich. Jan. 21, 2022) (same).

[20] As the Students acknowledge, the Secretary enforces these requirements by requiring healthcare providers to

15

Section 360bbb-3(e)(1)(A) does not impose any obligations on *state universities*, it cannot conflict with Rutgers' Policy.

Second, the Students were not deprived of the right "to accept or refuse" the vaccine. In fact, all but one Student exercised their right to refuse and remain unvaccinated. Rutgers' Policy simply provided the Students with three options: get the vaccine, apply for an exemption, or pursue education elsewhere (*i.e.*, in a remote Rutgers program or at another university). That choice may have been difficult. But there is no unqualified right to decide whether to "accept or refuse" an EUA product without consequence.[21] To the contrary, being advised of the consequences is precisely what § 360bbb-3(e)(1)(A)(ii)(III) requires, providing explicitly that the recipient of an EUA product shall be informed "of the consequences, if any, of refusing administration of the product." Nor is there an unqualified right to attend a university, let alone the university of one's choice, without

distribute to potential vaccine recipients an authorized fact sheet which states: "[i]t is your choice to receive or not receive [the vaccine]." JA 187; *accord Norris*, 73 F.4th at 438 ("The EUA statute's relevant language . . . addresses the interaction between the medical provider and the person receiving the vaccine . . . . ").

[21] *Accord Norris*, 73 F.4th at 438 ("The statute is meant to ensure patients' consent to the pharmaceutical they are receiving, but this does not mean that MSU cannot require vaccination as a term of employment."); *Johnson v. Brown*, 567 F. Supp. 3d 1230, 1256-57 (D. Or. 2021) (Plaintiffs had informed consent where they retained the option to "get the vaccine, apply for an exception, or look for employment elsewhere").

conditions. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973) (no fundamental right to education); *Kolbeck v. Kramer*, 202 A.2d 889, 889-90 (N.J. Super. Ct. Law. Div. 1964) (recognizing vaccination as a permissible condition of university admittance, with accordance for religious exemptions).

We will therefore affirm the dismissal of the Students' preemption claim.

## 2. State Law Authorization

Next, the Students assert that Rutgers' Policy is *ultra vires* under New Jersey law. Though a "state university" of New Jersey, N.J.S.A. 18A:65-1, Rutgers has aspects of both a private and public institution.[22] Thus, while it is not a state actor for Eleventh Amendment purposes, *see Kovats v. Rutgers*, 822 F.2d 1303, 1312 (3d Cir. 1987), it is still considered a government instrumentality for purposes of constitutional and federal civil rights law, *San Filippo*, 961 F.2d at 1134 n.12. As the New Jersey Supreme Court explained, unless Rutgers' "public status"—and, therefore, the applicability of a state law or rule to the university—would "frustrate the purposes of Rutgers' charter or the primary

---

[22] Nothing we say here limits the authority of private universities to require vaccines as a condition of attendance or participation, within the bounds of any applicable statutory limitations. *See, e.g.*, *Bishop v. Univ. of Scranton*, No. 3:22-CV-01831, 2023 WL 4565468, at *3-5 (M.D. Pa. July 17, 2023); *Storino v. N.Y. Univ.*, 146 N.Y.S.3d 594, 596 (N.Y. App. Div. 2021); *Doe v. N.Y. Univ.*, 537 F.Supp.3d 483, 494-496 (S.D.N.Y. 2021).

17

purpose of the underlying law or [r]ule, Rutgers ordinarily should be considered an instrumentality of the state." *Fine*, 750 A.2d at 71-72 (citations omitted).

In this case, pointing to particular state statutes and rules, Appellants contend that Rutgers lacks authority either (i) to require COVID-19 vaccination as a condition of attendance; or (ii) to exclude unvaccinated students from university housing. Yet both claims fail as a matter of law.

As for the first, Rutgers' authority to require COVID-19 vaccination is found in the interplay between N.J.S.A. § 18A:61D-1 and N.J. Admin. Code § 8:57-6.4. The former obligates state universities to require students to provide proof of certain mandatory vaccinations in accordance with New Jersey Department of Health regulations. *See* N.J.S.A. § 18A:61D-1. The latter, N.J. Admin. Code § 8:57-6.4, is the implementing regulation that authorizes state universities "to establish additional requirements for student immunizations and documentation that [they] shall determine appropriate," if, as here, the vaccines are "recommended by the ACIP"—the Advisory Committee on Immunization Practices within the CDC. *See COVID-19 ACIP Vaccine Recommendation*, Centers for Disease Control and Prevention, https://bit.ly/3x7u7ee (recommending all COVID-19 vaccines with emergency use authorization).

The Students retort that "[t]he ACIP recommendations . . . require compliance with 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III)." Opening Br. 34. But even aside from the fact that the Students have not demonstrated a violation of § 360bbb-3(e)(1)(A), this response misses the mark. N.J. Admin. Code § 8:57-6.4 authorizes Rutgers to require any

18

immunization that, as here, has been recommended by ACIP. That statutory authority does not depend on whether ACIP *should have* recommended the immunization or whether the HHS Secretary adequately ensured that medical providers obtain informed consent.

The Students' second claim—that Rutgers lacks authority to exclude exempt students from university housing—is debunked by longstanding historical practice, for schools have long required vaccination as a prerequisite for in-person attendance. *See Jacobson*, 197 U.S. at 25, 31-33 ("[T]he principle of vaccination as a means to prevent the spread of smallpox has been enforced in many states by statutes making the vaccination of children a condition of their right to enter or remain in public schools.") (citations omitted); *Kolbeck*, 202 A.2d at 889-90 (recognizing vaccination as a permissible condition of university admittance, with accordance for religious exemptions). Consistent with that practice, Rutgers' general vaccination policy required students to provide proof of certain vaccinations as a condition of attendance, "subject to amendment,"[23] and while that policy provided for medical and religious exemptions, it also alerted

---

[23] *See Section 10.3.13, Student Immunizations and Health Requirements*, Rutgers (Dec. 3, 2020), https://policies.rutgers.edu/sites/default/files/10-3-13-current.pdf (hyperlinked in Rutgers' April 13, 2021 student vaccination policy, *available at* Children's Health Defense, Inc. et al v. Rutgers et al, 3:21-cv-15333-ZNQ-TJB (Aug. 30, 2021), ECF No. 10-3) (hereinafter "Rutgers' Student Immunization Policy").

unvaccinated students that they may be removed from campus in case of a disease outbreak.[24]

Even aside from the terms to which the students agreed on as a condition of matriculation, N.J. Admin. Code §§ 8:57-6.14(d) and 6.15(c) provided Rutgers with statutory authority to "temporarily exclude a student with [medical or religious] exemptions . . . from classes and from participating in institution-sponsored activities" during outbreaks after a consultation with the Commissioner of Health.

In view of Rutgers' explicit statutory authority to take the actions it did, we perceive no error in the District Court's dismissal of the claim that the Policy was *ultra vires* under state law.

### 3. Substantive Due Process

The Students next allege that Rutgers' Policy violated their substantive due process rights under the Fourteenth Amendment. In reviewing such claims, we apply rational basis review unless there has been a violation of a fundamental right. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2283 (2022). Seeing none, we review the Policy for a rational basis and conclude that it satisfies this standard.

---

[24] *Id.*

i. Fundamental Right to Refuse Vaccination and Rational Basis Review

As federal courts have uniformly held, there is no fundamental right to refuse vaccination.[25]  A "fundamental right" must be either enumerated in the Bill of Rights or "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotations and citations omitted).  The Students fail to offer any historical example to establish a "fundamental right" to be free from a vaccine requirement at a public university.  To the contrary, the Supreme Court's decision in *Jacobson*, which sustained a

---

[25] *See, e.g.*, *Klaassen*, 7 F.4th at 593; *Lukaszczyk v. Cook County*, 47 F.4th 587, 603 (7th Cir. 2022); *Kheriaty*, 2022 WL 17175070, at *1; *Clark v. Jackson*, No. 22-5553, 2023 WL 2787325, at *6 (6th Cir. Apr. 5, 2023); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293 (2d Cir. 2021); *Bauer v. Summey*, 568 F. Supp. 3d 573, 592-93 (D.S.C. 2021); *Dixon v. De Blasio*, 566 F. Supp. 3d 171, 185 (E.D.N.Y. 2021), *vacated as moot*, No. 21-2666, 2022 WL 961191, at *1 (2d Cir. Mar. 28, 2022); *Harris*, 557 F. Supp. 3d at 313; *Norris v. Stanley*, 567 F. Supp. 3d 818, 821 (W.D. Mich. 2021); *Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1173 (D.N.M. 2021); *Williams v. Brown*, 567 F. Supp. 3d 1213, 1224-25 (D. Or. 2021).

criminal conviction for refusing to be vaccinated, conclusively demonstrates that there is no such right.  197 U.S. 11.

In *Jacobson*, the Supreme Court considered the constitutionality of a Massachusetts statute authorizing "the board of health of a city or town" to require all persons older than 21 to be vaccinated against smallpox.  *Id.* at 12.  In response to the state law, the city of Cambridge adopted a regulation requiring that all city inhabitants be vaccinated.  *Id.* at 12-13.  Jacobson did not comply with the mandate, was criminally prosecuted, was sentenced to pay a fine, and was ordered to "stand committed until the fine was paid." *Id.* at 13-14.  He appealed, claiming the Massachusetts law authorizing the local mandate violated his constitutional rights under the Fourteenth Amendment.  *Id.* at 14.

The Supreme Court upheld the statute, and in so doing, rejected the notion that individuals have a fundamental or unfettered right to refuse vaccination.  As it explained, the "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* at 26.  Instead, the Court recognized, "[t]here are manifold restraints to which every person is necessarily subject for the common good," *id.*, including a community's "right to protect itself against an epidemic of disease which threatens the safety of its members," *id.* at 27.

Finding no fundamental right, *Jacobson* applied a standard similar to modern rational basis review, stating that it would overturn "statute[s] purporting to have been enacted to protect the public health . . . or the public safety" only if they lacked any "real or substantial relation to those objects, or

22

[were], beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31; *see Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) ("Although *Jacobson* pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review.").

Appellants' attempts to distinguish *Jacobson* on the basis that it involved a "nearly 100-year old smallpox vaccine and a $5 fine" are unpersuasive. Opening Br. 44. While the Students allege that "so much remains unknown" about COVID-19 vaccines, JA 208, which, at the time of the Complaint, were in public use "for less than a year," *id.* at 207, *Jacobson* did not turn on the longevity of the vaccine or consensus regarding its efficacy. To the contrary, the Court recognized:

> The fact that the belief [in effectiveness] is not universal is not controlling, for there is scarcely any belief that is accepted by everyone. The possibility that the belief may be wrong, and that science may yet show it to be wrong, is not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases.

197 U.S. at 35. And the penalties for non-compliance in *Jacobson* were more, not less, severe than those at issue here:

23

The city ordinance authorized criminal prosecution and imprisonment for up to fifteen days.[26]  *Id.* at 13.

Nevertheless, the Students assert a right "to refuse unwanted medical treatment" based on cases they say supersede *Jacobson*.  Opening Br. 4.  For instance, they point to *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990), which recognized "the right of a competent individual to refuse medical treatment," *id.* at 277, in a case involving a request to refuse life support following a serious car accident, and *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), which acknowledged a right to "bodily integrity."[27]

These cases, however, are categorically distinct.  In stark contrast to *Jacobson* and its progeny, they involved health decisions with consequences for only the individual involved, rather than broad-based matters of "public health and safety."  197 U.S. at 12.  For that reason, the Supreme Court did not even have occasion to reference *Jacobson* in

---

[26] *See* Michael R. Albert et al., *The Last Smallpox Epidemic in Boston and the Vaccination Controversy, 1901-1903*, 344 NEW ENG. J. MED. 375, 375 (2001).

[27] To be sure, the Court in *Glucksberg* declined to recognize a fundamental right to physician-assisted suicide. *Id.* at 728.  It observed that in *Cruzan*, it "assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment."  *Id.* at 720.  But, it continued, "[t]he right assumed in *Cruzan* [] was . . . entirely consistent with this Nation's history and constitutional traditions," *id.* at 725, whereas there was no history supporting a fundamental right to assisted suicide, which had long been banned in the United States, *id.* at 728.

24

*Glucksberg*, and in *Cruzan*, the Court explained *Jacobson* as a case where "an individual's liberty interest in declining an unwanted smallpox vaccine" was outweighed by "the State's interest in preventing disease." 497 U.S. at 278.

The Court's more recent pronouncements confirm *Jacobson*'s vitality. Just last term, the Supreme Court declined to recognize a substantive due process right against substantial and lengthy intrusions on a person's right to control her body where even one "life or potential life" is at risk. *See Dobbs*, 142 S. Ct. at 2277 (citation omitted). Surely, then, it would not now recognize a fundamental right to avoid the "relatively modest" intrusion of a vaccine, *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 71 (Gorsuch, J., concurring), where innumerable lives are at risk. To the contrary, in the last three years alone, the Supreme Court has cited *Jacobson* five times,[28] and the federal appellate courts, for their part, have uniformly relied on *Jacobson* in dismissing challenges to vaccination requirements.[29]

---

[28] *See Chrysafis v. Marks*, 141 S. Ct. 2482, 2484 (2021) (Breyer, J., dissenting); *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 70-71 (Gorsuch, J., concurring); *id.* at 75-76 (Roberts, C.J., dissenting); *Food & Drug Admin. v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 10, 11-12 (2020) (Alito, J., dissenting); *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting); *id.* at 2614 (Kavanaugh, J., dissenting); *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring).

[29] *See Lukaszczyk*, 47 F.4th at 601; *Klaassen*, 7 F.4th at 593; *Clark*, 2023 WL 2787325, at *5-6; *We The Patriots USA,*

25

Our conclusion that *Jacobson* controls and the Students failed to state a substantive due process claim also resolves their claim under the unconstitutional conditions doctrine. To establish an unconstitutional condition, the Students needed to demonstrate that a state actor—here, Rutgers—"burden[ed] the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013). But there is no constitutional right either to refuse vaccination, *Jacobson*, 197 U.S. at 31, or to receive a public higher education, *San Antonio Indep. Sch. Dist.*, 411 U.S. at 35; *cf.* N.J. Const. art. VIII, § 4, para. 1 (requiring "thorough and efficient" education only for children ages 5 through 18). Thus, we join other courts in holding that, even viewing higher education as a government benefit, requiring vaccination as a condition of in-person matriculation is not an unconstitutional condition.[30]

*Inc.*, 17 F.4th at 293-94; *Norris*, 73 F.4th at 435-38; *Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015).

[30] *See Andre-Rodney v. Hochul*, 618 F. Supp. 3d 72, 84 (N.D.N.Y. 2022) (state employees "failed to plausibly allege a constitutional violation based on the unconstitutional conditions doctrine" because there is no fundamental right to refuse vaccination during a public health emergency); *Legaretta v. Macias*, 603 F. Supp. 3d 1050, 1071 (D.N.M. 2022) (because vaccine requirement does not violate fundamental rights, county employees could not state a claim for violation of the unconstitutional conditions doctrine); *Klaassen v. Trs. of Ind. Univ.*, 549 F. Supp. 3d 836, 870 (N.D. Ind. 2021) ("[T]he Constitution never provides a fundamental right to a collegiate education. Nor does it secure as a fundamental liberty a student's right to attend a public

In short, there is no fundamental right to refuse vaccination, nor any unconstitutional condition implicated here. Accordingly, we apply rational basis review to Rutgers' Policy as did the Court in *Jacobson* and as we have done traditionally with the policies of other universities. *See, e.g.*, *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 447 n.6 (3d Cir. 2000); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553-54 (3d Cir. 2007); *Benner v. Oswald*, 592 F.2d 174, 183-84 (3d Cir. 1979).

### ii. Rutgers' Policy and Rational Basis Review

Under rational basis review, Rutgers need only "set forth a satisfactory, rational explanation" for its Policy. *Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 747 F.3d 172, 180 (3d Cir. 2014). Curbing the spread of COVID-19 is "unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67. So, *a fortiori*, Rutgers' stated purpose—"to minimize outbreaks of COVID-19 among students; to prevent or reduce the risk of transmission of COVID-19 among all persons at Rutgers

---

university no matter his or her vaccinated status."), *vacated and remanded with instructions to dismiss as moot*, 24 F.4th 638 (7th Cir. 2022); *Smith v. Biden*, No. 21-cv-19457, 2021 WL 5195688, at *8 (D.N.J. Nov. 8, 2021) ("Plaintiffs are undeniably being presented with a difficult choice—comply with the vaccine mandate or risk losing their employment. They are, however, presented with a choice and are not being coerced to give up a fundamental right since there is no fundamental right to refuse vaccination.").

University and Rutgers-affiliated health care units; and to promote the public health of the community consistent with federal, State and local efforts to stem the pandemic"—is undoubtedly rational.[31] It is also grounded in the recommendations of experts, including at the CDC and FDA, which only authorized the vaccines for emergency use after determining "based on the totality of scientific evidence available . . . the known and potential benefits of the [vaccines] . . . outweigh the known and potential risks." 21 U.S.C. § 360bbb-3(c)(2)(B).

The Students acknowledge that at least one reason Rutgers adopted its vaccine Policy was to minimize the spread of COVID-19 among students, consistent with public health efforts. But they allege there was a second motive: that Rutgers "*also* adopted the Policy to curry favor with vaccine manufacturers with which they have partnered to investigate and develop COVID-19 vaccines." *Id.* (emphasis added). Because Rutgers was a clinical trial site for COVID-19 vaccine testing and had other existing relationships with pharmaceuticals, they contend, it was "conflicted from making any objective decision or imposing any mandate concerning the administration of COVID-19 vaccines upon its students," *id.* at 206, and "will gain financially if every man, woman and child in the state, the country and globally is coerced to take a COVID-19 vaccine it helped develop," *id.* at 207.

These allegations do not alter our conclusion that Rutgers' Policy is rational for three reasons. First, even assuming that Rutgers also had a secondary financial incentive to require vaccines for on-campus access, its other incentive—

---

[31] ECF No. 10-3 at 1.

28

protecting the health of its student body—is "unquestionably a compelling interest," *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67, and thus more than sufficient to satisfy rational basis review.

Second, Rutgers' "objectivity . . . to decide that emergency-use authorized COVID-19 vaccines are safe enough" and that the "benefits of these vaccines outweigh their risks" is irrelevant. JA 201. The decision as to the "safety and potential effectiveness" of the vaccines and that "the[ir] known and potential benefits . . . outweigh the[ir] known and potential risks," was made not by Rutgers but by the CDC, which made those findings as a precondition for emergency use authorization. *See* 21 U.S.C. § 360bbb-3(c)(2)(B).[32] What matters for rational basis review is that the CDC's objective, scientific judgment about the safety and relative benefits of the vaccines established the requisite nexus between vaccination and Rutgers' "compelling interest" in curbing the spread of COVID-19. *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67.[33]

---

[32] Under the EUA statute, 21 U.S.C. § 360bbb-3(c)(2)(B), the HHS Secretary may authorize a product for emergency use only if, after consultation with the Director of the CDC, among others, the Secretary concludes that "the known and potential benefits of the product . . . outweigh the known and potential risks." The authorization of the product must state the Secretary's conclusions "concerning the safety and potential effectiveness of the product[.]" *Id.* § 360bbb-3(d)(3).

[33] As the Students candidly admitted at oral argument, the crux of their Complaint is not that Rutgers lacked a rational basis for following the CDC's recommendation, but that the

29

Lastly, as Rutgers pointed out in its motion to dismiss, the assertion that, by virtue of participating in clinical trials or its other ties with pharmaceutical companies, Rutgers had some "stake in the approval and widespread dissemination and use of COVID-19 vaccines," JA 206, is the sort of "conclusory or 'bare-bones' allegation[] [that] will no[t] [] survive a motion to dismiss," *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). The Complaint identifies nothing but "information and belief" for the proposition that allowing Johnson & Johnson or Pfizer to conduct clinical trials on site somehow gave Rutgers an interest in the outcomes of those trials or the eventual decision of the FDA. JA 206-07. Neither do its allegations of a prior Pfizer grant to the School of Engineering or a fellowship program that the pharmaceutical industry had been funding, *id.* at 205-06— without more—support the inference that Rutgers would gain financially from "every man, woman and child . . . globally [being] coerced to take a COVID-19 vaccine," *id.* at 207. The Students hypothesize that linkage, but that is not "enough to raise a right to relief above [a] speculative level." *Twombly*, 550 U.S. at 555; *see also Xi v. Haugen*, 68 F.4th 824, 841 (3d Cir. 2023) ("We may not fill this gap in [their] pleading with speculation.").[34]

CDC's recommendation itself lacked a rational basis and that the Students should therefore have "the opportunity to take this case to discovery . . . to assess the statement of the CDC and test it." Oral Arg. Tr. 49:15-18.

[34] It is not clear from the Students' briefing whether they intend to pursue an independent claim for Rutgers' masking and testing requirements or if they challenge those requirements only as part of their claim for disparate treatment

30

### 4. Equal Protection

In the third count of their Complaint, the Students claimed that Rutgers denied them equal protection of the law by discriminating against (1) students relative to faculty and staff, and (2) vaccinated students relative to unvaccinated students (including "naturally immune" students). We consider whether the first of these arguments is moot, the proper standard of review, and, finally, the merits of the Students' equal protection claim.

#### i. Mootness

By the time the District Court ruled on Rutgers' motion to dismiss, Rutgers had extended the in-person vaccination requirement of its Policy to all of its employees pursuant to President Biden's Executive Order 14042.[35] The District Court

under the Equal Protection Clause. To the extent they pursue a freestanding claim, it is meritless. As federal courts have routinely recognized, such challenges do not state constitutional claims. *See, e.g.*, *Klaassen*, 7 F.4th at 593 ("These plaintiffs just need to wear masks and be tested, requirements that are not constitutionally problematic."); *Pavlock*, 2022 WL 3975177, at *4; *George*, 2022 WL 16722357, at *11–12; *McArthur v. Brabrand*, 610 F. Supp. 3d 822, 835 (E.D. Va. 2022). The Students' equal protection challenge is addressed below. *See infra* Section III.B.4.

[35] *See* Antonio M. Calcado, *President Biden's Executive Order Requiring Coronavirus Vaccines*, Rutgers (Oct. 25, 2021), https://coronavirus.rutgers.edu/president-bidens-executive-order-requiring-coronavirus-vaccines/.

31

thus dismissed this aspect of the Students' equal protection claim, reasoning that the Students "are now treated similarly to [staff and faculty] with respect to the vaccination requirements and the Court can no longer give meaningful relief." JA 16. But that was true only in part: The District Court could no longer provide injunctive relief as to staff and faculty, but the Complaint also sought general damages, and even nominal monetary compensation qualifies as "effectual relief" for a constitutional violation. *Calderon*, 518 U.S. at 150. So, to the extent the Students seek monetary relief with regard to this aspect of their equal protection claim, *see infra* note 40, the District Court erred in holding that it was moot.

Although we disagree with the District Court's reasoning, "'[w]e exercise plenary review of the District Court's dismissal of the [Complaint],' and 'may affirm on any basis supported by the record, even if it departs from the District Court's rationale.'" *Host Int'l v. Marketplace, PHL, LLC*, 32 F.4th 242, 247 n.3 (3d Cir. 2022) (second alteration in original) (citations omitted); *see also Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 135 (3d Cir. 2019) (concluding that district court erred in dismissing the complaint for lack of jurisdiction and affirming on alternative grounds); *Int'l Internship Program v. Napolitano*, 718 F.3d 986, 988 n.2 (D.C. Cir. 2013) (Kavanaugh, J.) (holding that district court erred in declining to reach arguments on mootness grounds and affirming on the merits). Here, as in the District Court, Rutgers has argued that it had a rational basis for imposing the in-person vaccine requirement on students before it extended that requirement to its employees. We therefore proceed to

consider whether rational basis is the proper standard of review and, if so, whether it has been satisfied here.[36]

## ii. The Proper Standard of Review

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. But as we and the Supreme Court have clarified, "[t]his is not a command that all persons shall be treated alike but, rather, 'a direction that all persons *similarly situated* should be treated alike.'" *Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). So to bring a successful equal protection

---

[36] The Dissent would remand for the District Court to consider Rutgers' other arguments for dismissing the Students' equal protection claims. It is not apparent why the Dissent would dismiss the Students' *ultra vires* claim on the ground that Rutgers may act "as could a private university," Dissent 7, but would treat the Students' equal protection claim as if Rutgers were a government actor. In any event, a Court of Appeals "review[s] a district court's ruling granting a motion to dismiss *de novo*," *Hickey v. Univ. of Pittsburgh*, 81 F.4th 301, 308 (3d Cir. 2023), so as long as an alternative ground for dismissal was presented to the District Court, the Court of Appeals may affirm on that basis, *see Guerra*, 936 F.3d at 135; *Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 679-80 (2d Cir. 2015); *Napolitano*, 718 F.3d at 988 n.2; *Moncrief Oil Int'l v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007); *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974 (7th Cir. 2001); *In re Best Prods. Co. v. Resol. Trust Corp.*, 68 F.3d 26, 30 (2d Cir. 1995).

claim, plaintiffs "must demonstrate that they received different treatment from that received by other individuals similarly situated." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (quotation omitted). At the pleading stage, that means plaintiffs must adequately allege that they are "alike 'in all relevant respects,'" *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)), and must offer more than conclusory assertions, *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 663.

The level of scrutiny applied also differs depending on the nature of the classification at issue.[37] In the normal course,

---

[37] Our dissenting colleague would apply a heightened form of rational basis review to executive, as opposed to legislative, action that would not be satisfied by the state offering a conceivable rational basis for its action or the court hypothesizing the motivations of the state actor. Dissent 11-13. *Jacobson*, however, did not turn on the legitimacy of legislative action as opposed to executive action. The law in *Jacobson* granted significant power and discretion to local boards of health to determine how the mandate would be enacted. *Jacobson*, 197 U.S. at 12, 27. The Court stated that investing local, non-legislative bodies with "authority" over matters of public health was not only "appropriate" but also not "unusual" given "their fitness to determine such questions." *Id.* at 27; *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 668 (2022) (Gorsuch, J. concurring) (noting that "[h]istorically, such matters [as vaccine mandates] have been regulated at the state level by authorities who enjoy broader and more general governmental powers" in contrast to federal agencies). That observation is no less true today: In

34

classifications need only survive rational basis review. *See City of Cleburne*, 473 U.S. at 440. However, classifications affecting either fundamental rights or involving a protected class are subject to heightened scrutiny. *Id.* Unsurprisingly, the Students attempt to argue they fall into one of those two categories.

They do not. For the reasons explained above, the Students' claims do not involve a fundamental right. And though they posit that they "invoke[d] their Due Process rights," Opening Br. 52, that argument conflates the fundamental-rights and protected-class inquiries. The due process right by which they seek to distinguish themselves is, in any court, a meritless claim.[38] *See supra* Section III.B.3. Thus, we review only for rational basis.

---

times of crisis, agencies, governors, and local authorities may often be best-positioned to respond to conditions on the ground, a fact that state legislatures have recognized in granting emergency powers. *See, e.g.*, Emergency Health Powers Act, N.J. Stat. Ann. §§ 26:13-1 to -31; Civilian Defense and Disaster Control Act, N.J. Stat. Ann. app. A:9-30 to -63. There is simply no general principle under which we apply a more demanding rational basis review to non-legislative state action than we do to legislative state action during pandemics.

[38] Being unvaccinated or "naturally immune" to COVID-19 also does not confer protected status, as courts have uniformly held. *See, e.g.*, *Clark*, 2023 WL 2787325, at \*9 (holding, in COVID-19 vaccine mandate challenge, that "naturally immune" persons are not a suspect or quasi-suspect class); *Norris*, 567 F. Supp. 3d at 820-23 (same); *Kheriaty*, 2022 WL 1715070, at \*1 (applying rational basis review to

### iii. Adequacy of Pleadings Under the Proper Standard

To ascertain whether Rutgers had a rational basis for treating students differently from staff or vaccinated students differently from unvaccinated students, we first assess whether the Students met their burden to adequately allege that the comparator groups were "similarly situated." Here, again, conclusory assertions are insufficient at the pleading stage. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 663. Only if the comparator groups were indeed similarly situated do we then consider whether it was nevertheless rational for Rutgers to treat these groups differently.

### a. Differential Treatment of Students and Staff

Appellants contend that Rutgers' decision to impose the in-person vaccine requirement on them as of August 2021, and to only include health and safety personnel, and then all faculty

---

equal protection challenge to state university COVID-19 vaccine mandate); *Does 1-6 v. Mills*, 16 F.4th 20, 35 (1st Cir. 2021) (same, for state regulation requiring all workers in licensed healthcare facilities to be vaccinated against COVID-19); *George*, 2022 WL 16722357, at *10 ("Plaintiffs acknowledge unvaccinated individuals do not constitute a suspect class and, thus, their equal protection claim does not trigger strict scrutiny."); *Williams*, 567 F. Supp. 3d at 1228 (agreeing with "growing consensus" that "no fundamental right or suspect classification is implicated by [COVID-19] vaccine mandates and so rational basis review will apply").

and staff in October 2021, violated the Equal Protection Clause because staff and faculty were, in their view, "similarly situated." Opening Br. 52. But Appellants have failed to plead how and why students and staff are similarly situated, let alone to show that they were "alike 'in all relevant respects,'" *Harvard*, 973 F.3d at 205 (quoting *Nordlinger*, 505 U.S. at 10), and that is fatal to their equal protection claim, *see Melrose v. City of Pittsburgh*, 613 F.3d 380, 394 (3d Cir. 2010) (observing that an equal protection inquiry "properly places the initial burden on the complaining party first to demonstrate that it is 'similarly situated' to an entity that is being treated differently"). They allege no specifics as to why these different populations are similarly situated vis-à-vis the university's authority or their relative risks of communal spread. In fact, all the Students plead is that Rutgers violated equal protection because it required in-person vaccination for its students but not its staff and faculty.

Because that *ipse dixit* does not suffice under *Twombly* and *Iqbal*, 550 U.S. at 555; 556 U.S. at 663, it is readily apparent that the Students have failed to state a claim. And the reason for that, as Rutgers highlighted in the District Court and on appeal, is that students and faculty are not similarly situated.[39] First and foremost, those populations are treated

_____

[39] Far from "conced[ing] that the students are similarly situated" to faculty and staff, Dissent 16, Rutgers argued to the contrary *even though the Students appeared to waive this claim on appeal*. In their opening brief, the Students observed— without objection or argument—that the District Court had "resolved [the staff and faculty] classification as moot." Opening Br. 52. What they alleged as error was that the District Court failed to recognize that the "students also

37

very differently under the laws governing vaccination. New Jersey law explicitly authorizes institutions of higher education to require students to take ACIP-recommended vaccines. *See* N.J.S.A. § 18A:61D-1; N.J. Admin. Code § 8:57-6.4. Thus, students, even before the pandemic, were subject to Rutgers' immunization policy, which required them to submit their complete vaccination history at least six months before

---

alleged" two other equal protection claims: (1) "that Rutgers Policy unlawfully discriminates against [the Students] for invoking their Due Process rights," and (2) "that naturally-immune students . . . are similarly situated to vaccinated students and should be treated similarly." *Id.* And because "[t]he district court did not rule or otherwise address *those two particular claims of disparate treatment*," the Students argued, "those claims must survive." *Id.* (emphasis added). Of course, the only way the Students' staff-and-faculty claim would be moot, as they appeared to concede, was if the District Court correctly assumed they were seeking only equitable relief and not damages for that claim. *See Merle v. United States*, 351 F.3d 92, 94 (3d Cir. 2003) (we lack jurisdiction over claims that are no longer live or where "the parties lack a legally cognizable interest in the outcome") (citation omitted). Rutgers thus focused primarily on what it reasonably perceived to be "Plaintiffs' two Equal Protection claims" on appeal, Answering Br. 37, and argued only secondarily why its disparate treatment of students and employees would satisfy rational basis review "even had Rutgers continued to apply the Policy only to students." *Id.* at 38. Prioritizing its response this way makes perfect sense in view of the Students' bait-and-switch, *see* Reply Br. 26 (arguing for the first time on appeal that the District Court erred in finding the faculty-and-staff claim moot), and regardless, does not constitute a concession.

enrollment, required in-person students to be vaccinated against even less virulent viruses like influenza, and reserved Rutgers' right to deny unvaccinated students access to housing or class registration in the "case of a public health emergency."[40] That policy was "subject to" unilateral amendment by Rutgers.[41]

In contrast, Rutgers' ability to impose such requirements on staff and faculty is far more constrained. *See, e.g.*, N.J.S.A. § 34:13A (discussing public employee collective bargaining rights); Oral Arg. Tr. 43:11-16 (same); N.J.S.A. § 18A:6-18 (discussing tenure rights). Not until President Biden's Executive Order 14042, concerning university faculty and staff in September, was it even clear that universities were legally authorized to require that population be vaccinated. When that became clear, Rutgers extended the requirement to staff and faculty as well—just one month after the start of the school year.[42]

Rutgers' adoption of the Policy for students before staff and faculty was also consistent with its stated priority for the start of the fall term "[t]o minimize outbreaks of COVID-19 among students,"[43] even before taking on the more ambitious goal of requiring employee vaccinations to protect the broader

---

[40] Rutgers' Student Immunization Policy.

[41] *Id.*

[42] *See* Antonio M. Calcado, *President Biden's Executive Order Requiring Coronavirus Vaccines*, Rutgers (Oct. 25, 2021), https://coronavirus.rutgers.edu/president-bidens-executive-order-requiring-coronavirus-vaccines/.

[43] ECF No. 10-3 at 1.

"Rutgers University community," JA 350. As Rutgers explained in the District Court and on appeal, "even if a university only require[d] students to be vaccinated, this [would] ha[ve] a rational basis" for the reasons set forth in *Harris v. University of Massachusetts, Lowell*, JA 297; Answering Br. 29 n.1, 38, namely, "the higher transmission rate among young people, and the fact that it is the students who are congregating in close quarters on campus," 557 F. Supp. 3d 304, 313 (D. Mass. 2021) (citations omitted); *see also* Oral Arg. Tr. 43:24-25 (Rutgers' counsel explaining that students, who sit "shoulder to shoulder" in classrooms and live in communal settings present a greater risk of transmission than faculty and staff who are typically at a distance). Rutgers also highlighted "the logic of excluding unvaccinated persons from communal living situations during a pandemic, because alternatives like masking are not feasible in dormitory life." JA 283. In sum, Rutgers adequately explained why Students are situated differently in the most "relevant respect[]," *i.e.*, containing a virus that spreads through close personal contact. *Harvard*, 973 F.3d at 205 (quoting *Nordlinger*, 505 U.S. at 10).

In view of these differences, Rutgers easily passes the low threshold for a "rational basis" to require vaccination for students in April 2021 before requiring the same of health care workers in June and other staff and faculty in October 2021. And that does not change even if the Policy is viewed (at least initially and briefly) as underinclusive because rational-basis review, unlike strict scrutiny, tolerates an "imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993). In other words, "the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. It is enough that the State's action be rationally based and free from

40

invidious discrimination." *Dandridge v. Williams*, 397 U.S. 471, 486-87 (1970) (citation omitted). Rutgers' action in requiring in-person vacation for students matriculating in September 2021 and requiring the same of staff and faculty in October 2021 satisfies that rational basis standard.

> b. Differential Treatment of Vaccinated Students and Unvaccinated Students with "Natural Immunity"

The Students next contend that "naturally immune students (who recovered from a COVID-19 infection) are similarly situated to vaccinated students" and, therefore, must be treated similarly. Opening Br. 52. Again, they are mistaken.

For one, the CDC itself determined that these groups posed different risks. *See Frequently Asked Questions about COVID-19 Vaccination*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html (last visited December 19, 2023) ("People who already had COVID-19 and do not get vaccinated after their recovery are more likely to get COVID-19 again than those who get vaccinated after their recovery."). And per N.J. Admin. Code 8:57-6.4, Rutgers followed the CDC's recommendations. That Appellants would reach a different conclusion than those experts does not render Rutgers' vaccine Policy arbitrary or irrational.

Second, Rutgers sought to comply with "[s]tate law," JA 350, and New Jersey allows evidence of immunity in lieu of vaccination only where a student is able to provide "laboratory evidence of immunity." *See* N.J.S.A. § 18A:61D-1 (providing that students may submit "evidence of immunity"

41

as an alternative to a valid immunization record, "in accordance with regulations promulgated by the Department of Health"); N.J. Admin. Code § 8:57-6.16 (directing institutions to maintain student records of immunization or "laboratory evidence of immunity"). At the time Rutgers enacted its Policy, "no laboratory test exist[ed]" that would satisfy that requirement. JA 307. And still today, "[a]ntibody tests are not recommended or authorized by FDA to assess someone's immunity after COVID-19 vaccination." *Antibody Testing*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing/antibody-tests-gui delines.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Flab%2Fresources%2Fantibody-tests.html#AntibodyTests (last visited December 19, 2023).

And again, even if Rutgers' Policy was "to some extent both underinclusive"—by (initially) excluding certain staff members—"and overinclusive"—by including students with 'natural immunity'—"perfection is by no means required" under rational basis review. *Vance v. Bradley*, 440 U.S. 93, 108 (1979) (citation omitted).

In sum, Rutgers set forth a rational basis for its differential treatment not only of students and staff, but also of vaccinated and unvaccinated students with "natural immunity."

\* \* \*

We conclude by acknowledging the difficult choices confronted by all parties here as they navigated the uncharted territory of the COVID-19 pandemic and its aftermath. Rutgers had to decide in real time, on a changing landscape of

42

executive pronouncements and medical judgments, how to sustain its educational mission while protecting the safety of its student body. Students had to choose whether to vaccinate and resume in-person or to decline and proceed masked (for exempt students) or remotely or elsewhere (for non-exempt students). None of these options were ideal, and no doubt they created hardship for many. What we judge today, however, is not the wisdom of any party's choice but whether the Complaint stated a claim. It did not. Because Rutgers was statutorily permitted to impose the requirements it did, and Appellants have not pleaded a constitutional violation on rational basis review, the District Court properly granted Rutgers' motion to dismiss, and we will affirm.

## IV. Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.

*Children's Health Defense, Inc., et al., v. Rutgers, The State University of New Jersey, et al.*, No. 22-2970

_____

JORDAN, *Circuit Judge*, concurring in part, dissenting in part.

I agree with much of what my colleagues have said in their Majority opinion, though I doubt that there is anything inherent in the nature of a university that required imposing the vaccine mandate, as my colleagues seem to imply. The administrators of Rutgers University had a range of choices, and the wisdom of the one they selected is open to debate. That doesn't make it unlawful, but it doesn't make it laudatory either. Given that Rutgers allowed its faculty and staff to begin the Fall 2021 semester unvaccinated while compelling students to have a COVID-19 shot (as if the SARS-CoV-2 virus[1] were careful about academic status), and further given that Rutgers stopped Plaintiff Adriana Pinto – a student just a few credits shy of qualifying for graduation – from attending a single course remotely, even though the course allowed remote attendance and even after she submitted a sworn statement that she would not set foot on campus for the entire semester, there is ample room to question why the University chose to force vaccines on students as it did.

Indeed, in a video circulated to the entire Rutgers student body two-and-a-half months before the mandate was announced, Rutgers Vice President for Health Affairs, Vicente

_____

[1] The SARS-CoV-2 virus is the cause of the illness the world has come to know as COVID-19.

H. Gracias, M.D., rejected the idea of mandatory vaccination. His words are worth repeating:

> "[I]t is America.  And Rutgers is part of America. So, the vaccine at this point is not mandatory across the United States or here in New Jersey. And certainly Rutgers, with our stance of human liberties and our history of protecting that, the vaccine is not mandatory.  It is something that we think, because we are a university, we can educate our community and we can educate ourselves.  And I think we can show everyone that it is essential that our Rutgers community vaccinate itself."[2]

This Court is not tasked with assessing the wisdom of Rutgers's about-face on education versus compulsion when it comes to vaccination.  One can wonder why it made that turn and, further, why the University is still mandating vaccination when the rest of the world has largely put the COVID-19 pandemic in the rearview mirror, but our role is confined to ascertaining whether the mandate comports with controlling

---

[2] The video is available on the internet at the following link: https://vimeo.com/502384549/10286f6cb1?utm_campaign=5370367&utm_source=affiliate&utm_channel=affiliate&cjevent=ea9051b9045311ec80c547850a82b838&clickid=ea9051b9045311ec80c547850a82b838 [https://perma.cc/8DNE-6B9U].  The relevant 40 seconds of the clip begins at approximately 7:30.

law.[3]  The constitutional questions here turn on whether the University's articulated reason for imposing the vaccine mandate rationally justified that imposition.  And my colleagues' answers to the questions on appeal are mostly correct.

For example, I concur in their disposition of the Plaintiffs' federal preemption claim.  I also concur in their judgment as to both the Plaintiffs' state law *ultra vires* claim and the equal protection claim as it relates to natural immunity, though I differ on the analytical approach to the former and conclude that the latter was not properly preserved for our review.  Further, I agree that we ought to apply rational basis review to the challenged vaccine mandate, which is an executive action of the University.

Nevertheless, I depart from the Majority's judgment on two significant issues.  First, I believe we should remand the Plaintiffs' equal protection claim as it relates to Rutgers's still unexplained initial decision to impose a vaccine mandate on students while leaving the faculty and staff free to abstain.  Rational basis review requires us to look to the rationale Rutgers gave for imposing the mandate, not to some

---

[3] As of February 5, 2024, the University's website states that "COVID-19 vaccines are **required** of students and employees unless granted a medical or religious exemption by the university."  *COVID-19 Information*, Rutgers, https://coronavirus.rutgers.edu/ [https://perma.cc/6US6-2CK3] (emphasis in original).

hypothetical rationale the University might wish it had given, or, as in this case, one the Majority devises.[4]

Second, as to the substantive due process claim, while I do not gainsay my colleagues' conclusion that the University's vaccine mandate satisfied rational basis review when it was issued, I believe we should remand to allow the Plaintiffs the

---

[4] The rationale for the University's vaccine mandate policy is stated under the apt heading: "Reason for Policy." JA 350. It provides that vaccination is mandated:

> [t]o minimize outbreaks of COVID-19 in the Rutgers University community; to prevent or reduce the risk of transmission of COVID-19 among all persons at Rutgers University and Rutgers–affiliated health care units; and to promote the public health of the community in a manner consistent with federal, State, and local efforts to stem the COVID-19 pandemic as well as federal and State law.

(*Id*.)

On April 13, 2021, Rutgers formally adopted policy section 10.3.14 entitled, "Interim COVID-19 Immunization Record Requirement for Students." JA 226 ¶ 196. The Policy that the parties provided in the Joint Appendix is not the original policy; it is the one revised in November 2021. The original appears on the District Court's docket. The reason given in both the original and revised sections is the same except that, before the Rutgers faculty and staff were subjected to the vaccine mandate, the phrase, "To minimize outbreaks of COVID-19 in the Rutgers University community," had read, "To minimize outbreaks of COVID-19 among students[.]" ECF No. 10-3 at 1.

4

opportunity to amend their complaint to challenge the continued imposition of the mandate. The reasons Rutgers gave to justify the mandate's continued existence – namely, compliance with federal and state government pandemic policies – were circumstance-specific and those circumstances have manifestly changed.

## I. POINTS OF AGREEMENT

### A. Rational Basis Review

The Majority holds that there is not a fundamental right to refuse vaccination, citing the Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and the apparent uniform treatment of *Jacobson* by federal courts that have reviewed COVID-19 vaccination mandates. I agree that, although *Jacobson*, which dealt with a smallpox vaccine mandate, "pre-date[s] the modern tiers of scrutiny" used to analyze constitutional rights, the opinion in that case "essentially applied rational basis review[.]" *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring). Accordingly, rational basis review is rightly applied to the Plaintiffs' equal protection and substantive due process challenges.

The Majority is also on logically sound ground when it observes that, if the University's proffered reasons for imposing the vaccine mandate pass rational basis review, those reasons do not become irrational if one accepts, as we must at this stage, the truth of the Plaintiffs' allegation that the vaccine mandate was "*also* adopted … to curry favor with vaccine manufacturers with which [Rutgers] ha[s] partnered to investigate and develop COVID-19 vaccines." Maj. Op. 28

5

(quoting JA 253) (emphasis added by Majority). That conclusion is consistent with precedent showing the parallels between rational basis review of executive action and arbitrary and capricious review under the Administrative Procedure Act ("APA"). *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) ("[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons."). Thus, I agree with my colleagues that the outcome is not changed by allegations of mixed motive.

### B. The Ultra Vires Claim

I likewise agree with the Majority that the Plaintiffs' *ultra vires* claim is untenable. But I would reach that conclusion for the reasons we explored at oral argument, in particular the interplay of our decision in *Kovats v. Rutgers, The State Univ.*, 822 F.2d 1303 (3d Cir. 1987) (discussed *infra* note 6), and the subchapter of the New Jersey Administrative Code dealing with vaccination requirements for college students. Section 8:57-6.4(c) of the New Jersey Administrative Code provides: "Nothing in th[e aforementioned] subchapter shall be construed as limiting the authority of a New Jersey institution of higher education to establish additional requirements for student immunizations and documentation that such institution shall determine appropriate and which is recommended by the ACIP."[5] The

---

[5] As noted by the Majority, ACIP is the acronym for the Advisory Committee on Immunization Practices within the Centers for Disease Control and Prevention.

Plaintiffs do not dispute that the ACIP has recommended the mandated vaccines.

But, of course, not "limiting" authority is different than granting authority. The authority must have been granted in the first place. And the source of Rutgers's authority is what we recognized in *Kovats*: that the State of New Jersey has expressly granted Rutgers, a previously private institution, the authority to continue to function, in effect, as a private university with respect to its operations, with minimal limitations, none of which prevents its imposing a vaccine mandate on its students, faculty, and staff, as could a private university.[6]  822 F.2d at 1311.

---

[6] In articulating why Rutgers does not have sovereign immunity under the Eleventh Amendment, we explained in detail how Rutgers functions, tracing its origin as "a private institution" to becoming a "corporation which is an 'instrumentality of the state'" in 1956. *Kovats v. Rutgers, The State Univ.*, 822 F.2d 1303, 1306-12 (3d Cir. 1987). In short, Rutgers is governed primarily by two bodies: a Board of Governors and a Board of Trustees. *Id*. at 1311. For our purposes, those boards are free to govern Rutgers as if it were a private university. "In running the university, the governors and trustees are 'given a high degree of self-government.'" *Id*. at 1311 (quoting N.J. Stat. Ann. § 18A:65-27(I)(a)). And, "[m]ore generally, both boards may exercise their powers 'without recourse or reference to any department or agency of the state, except as otherwise expressly provided by this chapter or other applicable statutes.'" *Id*. (quoting N.J. Stat. Ann. § 18A:65-28). Further, we explained that the "two limitations [imposed] on the boards' operation" of Rutgers, namely, that they comply with the "state's budget

7

The Plaintiffs have not identified any restriction on Rutgers's ability to impose vaccine mandates on its students under state law. Instead, they go far afield, asserting the incompatibility of allowing Rutgers to require vaccines beyond those already specified in state regulations. *See* N.J. Admin. Code §§ 8:57-6.5 through 8:57-6.9 (requiring vaccination for measles, mumps, rubella, meningitis, hepatitis-B). But once it is understood that Rutgers has been broadly empowered to operate like a private university, unless expressly restricted, the Plaintiffs' *ultra vires* claim crumbles. It is on that basis that I concur in the dismissal of the claim.

Likewise unavailing is the Plaintiffs' assertion that, under N.J. Admin. Code §§ 8:57-6.14(d) and -6.15(c), Rutgers cannot deny university housing to unvaccinated students, even those who were exempted from the mandate because of medical or religious reasons. As the Plaintiffs observe, those regulatory provisions restrict Rutgers from excluding exempted students from two – and only two – things: "classes" and "participat[ion] in institution-sponsored activities[,]" N.J. Admin. Code §§ 8:57-6.14(d) and 6.15(c), unless two circumstances are met. First, there must be "a vaccine-preventable disease outbreak." *Id.* And, second, the "decision to exclude" an exempted student must be "made by the institution in consultation with the Commissioner [of Health.]" *Id.* §§ 8:57-6.14(d)(1) and 8:57-6.15(c)(1). As the Plaintiffs see it, because those regulations are silent on whether a university can exclude students from university housing, there

appropriations" and "state laws and regulations[,]" result in "minimal" "state intervention." *Id*.

8

is no authority for Rutgers to do so. They also argue that the two required conditions were not met here.

The Plaintiffs fail to appreciate that §§ 8:57-6.14(d) and 6.15(c) provide *no* limitation on Rutgers's authority to exclude the Plaintiffs from housing. As just noted, those two provisions operate as a limitation on authority only with respect to the two things identified, classes and activities, not as to housing, which the Plaintiffs acknowledge is not covered by the text of those provisions. Consequently, I concur in the Majority's conclusion that the exempted students were not improperly excluded from university housing under state law.

## II.     POINTS OF DISAGREEMENT

### A.     Equal Protection Claim Relating to Faculty and Staff

I now turn to the equal protection claim relating to the University's different treatment of students on the one hand and faculty and staff on the other. I have two points of agreement with my colleagues, and a whole lot of disagreement on this subject. As to where we can agree, I concur in my colleagues' judgment regarding the Plaintiffs' equal protection claim as it relates to natural immunity, but I do so without reaching the merits. Rutgers argues before us that, for the Plaintiffs to succeed on this claim, an "approved laboratory test for immunity conferred by infection" must have existed when the vaccine mandate was imposed. Answering Br. 39. That prompted no response by the Plaintiffs in their reply brief, which effectively concedes the point. *See Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005) (explaining that failure to respond to an opponent's arguments

9

"waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the [opponent]"). The issue having been forfeited, Rutgers gets a win.

I further agree that the District Court erred in holding the equal protection claim to be moot. It did so at Rutgers's urging because, after the commencement of this action, the University imposed a vaccine mandate on its faculty and staff that it justified as being necessary to comply with President Biden's Executive Order 14042, which imposed a vaccine mandate on certain federal government contractors. 86 Fed. Reg. 50,985 (Sept. 9, 2021). But the dismissal on grounds of mootness was error since, as the Majority recognizes, the Plaintiffs have put forward a claim for damages for the period that students were being treated differently than other members of the University community. Thus, we have a live equal protection claim that the District Court never analyzed on the merits.

That's where our consensus ends. Our ordinary course when a district court has not spoken on a live issue is to vacate the dismissal and remand for the court to address the issue in the first instance. *See O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 763 n.3 (3d Cir. 2021) (citation omitted) ("[A]s a 'court of review, not of first view,' we will analyze a legal issue without the district court's having done so first only in extraordinary circumstances."). But the Majority does not do that, despite identifying no extraordinary circumstance. Instead, it justifies dismissal on the merits on grounds that are not properly before us and, in any event, do not withstand examination.

10

Although a legislative enactment will survive rational basis review if "the State offers a conceivable rational basis for its action, and '[t]he court may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the provision under attack[,]'" *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 367 (3d Cir. 2012), rational basis review of an executive action – like Rutgers's vaccination policy – is different. We must, under our precedent, look to the reasons Rutgers itself gave for its action, rather than hypothesizing reasons that it could have given.[7] *Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 747 F.3d 172, 180 (3d Cir. 2014). As noted earlier, such review of executive action is akin to arbitrary and capricious review under the APA. *See Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 353 (3d Cir. 2017) ("We have held that the standard for determining whether an APA violation exists under the arbitrary and capricious standard is substantially similar to rational basis review[.]"); *see also Nazareth Hosp.*, 747 F.3d at 180 (noting the similarity of the two types of review and stating

---

[7] The Majority suggests that dismissing the Plaintiff's ultra vires claim because Rutgers can function as a private institution in its operations is inconsistent with treating it as a state university for the Plaintiff's equal protection claim. Maj. Op. 33 n.36. Not so. The State of New Jersey may grant Rutgers autonomy over its operations, but it cannot grant it immunity from constitutional violations. Therefore, although Rutgers has a sphere of authority to act as a private institution in its operations for state law purposes, it is not relieved from the requirement that it must provide a rational basis when it discriminates against similarly situated persons.

11

that, "[t]aken together, we need only consider whether the Secretary set forth a satisfactory, rational explanation for her actions here").

Bear in mind that no decisionmaker from Rutgers has ever suggested a justification for the University's disparate treatment of students as compared with faculty and staff. The single-sentence given to explain the vaccine mandate on students – the "Reason for Policy" – offers no such rationale.[8] JA 350 (quoted *supra* note 4). Furthermore, Rutgers did not suggest in the District Court, or in its brief before us, that any of its decisionmakers had a rational basis for initially excluding faculty and staff. *See Simko v. United States Steel Corp.*, 992 F.3d 198, 205 (3d Cir. 2021) (explaining a party forfeits an argument for purposes of our review if it is not raised before the district court); *Geness v. Cox*, 902 F.3d 344, 355 & n.6 (3d Cir. 2018) (noting that arguments not raised on appeal are

_____

[8] The public announcement by Rutgers's Executive Vice President and Chief Operating Officer in connection with the imposition of the vaccine requirement on faculty and staff, cited by the Majority at note 8, is titled "President Biden's Executive Order Requiring Coronavirus Vaccines." Antonio M. Calcado, Rutgers (Oct. 25, 2021), https://coronavirus.rutgers.edu/president-bidens-executive-order-requiring-coronavirus-vaccines/ [https://web.archive.org/web/20230920233021/https://corona virus.rutgers.edu/president-bidens-executive-order-requiring-coronavirus-vaccines/]. As the name suggests, it says, in effect, "President Biden made us do it."

likewise forfeited).  We are thus left with an executive action bereft of justification.[9]

My colleagues in the Majority forge ahead anyway, and, without adversary briefing, choose to answer a question that the District Court didn't.  I cannot join them in that exercise.  *See generally United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[A]s a general rule, our system is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief."

---

[9] My colleagues attempt to overcome that fact by suggesting that *Jacobson* "did not turn on the legitimacy of legislative action as opposed to executive action[,]" and asserting that, "[i]n times of crisis, agencies, governors, and local authorities may often be best-positioned to respond to conditions on the ground, a fact that state legislatures have recognized in granting emergency powers[.]"  Maj. Op. 34 n.37.  In essence, the Majority, without citing any relevant authority, says that a health pandemic relieves a state actor from providing any reason for its executive action.  That is not the law.  Local authorities may well have substantial authority to make, and be in the best position to make, decisions regarding public health.  But, even accepting that as true, government officials must provide a rational reason to justify their decisions.  And, as this case and the COVID-19 pandemic has generally shown, that requirement is especially important amid a health crisis in which government authorities exercise extraordinary power.  Such exercises of power without explanation may breed doubt about the government's underlying motives for implementing safety measures.

(internal quotation marks and citation omitted; second alteration in original)).

1.      *Rutgers bore the initial burden on its motion to dismiss*.

First, the Majority contends that the Plaintiffs "have failed to plead how and why students and staff are similarly situated, … and that is fatal to their equal protection claim." Maj. Op. 37.  Civil litigation is indeed a contest governed by burdens of proof and persuasion.  But it is well-settled that "the burden of persuasion" is on "the defendant bringing a Rule 12(b)(6) motion … [to] show that the plaintiff has not stated a claim[.]" *Potter v. Cozen & O'Connor*, 46 F.4th 148, 155 (3d Cir. 2022); *see also Davis v. Wells Fargo*, 824 F.3d 333, 350 (3d Cir. 2016) ("[T]he burden of persuasion … properly falls on [the movant] on a motion to dismiss under Rule 12(b)(6)[.]").

My colleagues are correct that the Plaintiffs must state in their complaint how faculty[10] and students were similarly situated, but all that is required of the Plaintiffs at this stage is to plead how they were similarly situated to faculty "in all relevant respects[;]" they are not required to show that they were identically situated to faculty.  *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020).  The Majority's assertion that "all the Students plead is that Rutgers violated equal protection because it required in-person vaccination for its students but not its staff and faculty" is manifestly wrong.  Maj. Op. 37.  In

---

[10] Rather than always repeating the phrase "faculty and staff," I will often refer to "faculty" with the intent that the word encompass all University employees.

14

fact, the Plaintiffs pled how faculty and students are similarly situated in what is arguably the only relevant way, stating in their complaint: "Defendants are applying and enforcing Rutgers' Policy in a discriminatory, arbitrary and capricious manner by excluding staff and employees who are *equally capable of being infected with SARS-CoV-2 and transmitting it to others*, including students who have recovered from COVID-19, students who have medical exemptions, students with religious exemptions, and vaccinated students."[11]   JA 257-58 (emphasis added).  The Plaintiffs then alleged that "Rutgers' Policy and practice of discriminating against students by mandating EUA COVID-19 vaccines for them but not for the administration, faculty, staff, employees or contractors of Rutgers denies students equal protection of the law." JA 259.

The Plaintiffs thus adequately pled how they were similarly situated to faculty and staff: both students and staff can be infected and infect others with COVID-19.  Upon that adequate pleading, Rutgers had the burden to rebut the Plaintiffs' contention that faculty and staff were similarly situated to students.  It did not make any such argument before the District Court.[12]  And on appeal, Rutgers failed to address

---

[11] This allegation, although in the substantive due process claim of the Plaintiff's complaint, was incorporated into the Plaintiff's equal protection claim.  The Majority does not address this allegation in its opinion.

[12] Rutgers devoted one paragraph to this claim in its briefing before the District Court.  Affording that argument the most generous possible reading, Rutgers contended that, because of Executive Order 14042, faculty and staff would no

at all the merits of the equal protection claim relating to the more favorable treatment given to faculty and staff.[13] The sole basis for the District Court's order on this equal protection claim was mootness. So, with respect to the "similarly situated" issue, the Plaintiffs were not faced with anything requiring a response and, consequently, cannot be said to have failed to discharge the burden of proving that they were similarly situated to other people on campus.

Moreover, a fair argument can be made that Rutgers has conceded that the students are similarly situated. In the District Court, the Plaintiffs claimed that "Rutgers' initial decision to mandate [vaccinations for] students but not staff and employees intentionally treated them differently from others similarly situated and that there is no rational basis for the difference in treatment[.]" ECF No. 42 at 19. They made the same assertion before us. Opening Br. 52 ("Students alleged that Rutgers' initial decision to mandate vaccines upon them, but not faculty or employees, treated them differently from others similarly situated."). Neither assertion drew a response from Rutgers that the Plaintiffs were not similarly situated with faculty and staff in some pertinent sense. So, it was Rutgers that did not discharge its burden, and a failure to meet an opponent's assertion can operate as a concession that the assertion is correct. *See In re Bestwall LLC*, 47 F.4th 233, 244

---

longer be treated differently and, accordingly, the claim was moot, or, if not moot, that the claim now failed on the merits. But none of that explains the period of disparate treatment.

[13] The word "faculty" nowhere appears, and "staff" appears only in an unrelated context.

16

(3d Cir. 2022) (citing *In re Incident Aboard D/B Ocean King*, 758 F.2d 1063, 1071 n.9 (5th Cir. 1985)).

In any event, there was simply no suggestion that the students and the University employees were not similarly situated as alleged, and, after the Plaintiffs adequately pled that they were similarly situated, putting that issue in contention was the University's responsibility, not the Plaintiffs'. Despite my colleagues' citations to Rutgers's briefing, the fact remains that no party has made the arguments on appeal that my colleagues have made. The failure to raise an issue in the District Court and again on appeal has consequences, and, in this instance, the consequence should be clear: the "similarly situated" issue is off the table.

2. *Rutgers failed to proffer a rational basis for distinguishing between students and University employees.*

Even if we could rightly consider that issue, however, the arguments offered by the Majority that the Plaintiffs are not similarly situated to faculty and staff are unpersuasive. The reasons they assert are exactly the kind of after-the-fact justifications that we have been counseled to avoid. *See Dep't of Com.*, 139 S. Ct. at 2573 ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."); *New Jersey Hosp. Ass'n v. Waldman*, 73 F.3d 509, 517 (3d Cir. 1995) (explaining that reviewing courts have been "cautioned" to "not undertake an independent assessment" of an agency's action).

The first reason the Majority proffers is that students and faculty "are treated very differently under the laws governing vaccination." Maj. Op. 37-38. My colleagues explain that New Jersey law authorizes institutions of higher education to require certain vaccines for its students, but that Rutgers's "ability to impose such requirements on staff and faculty is far more constrained." Maj. Op. 39. The Majority, claiming Rutgers provided that reason, cites Rutgers's District Court briefing, in which Rutgers asserted that there is a rational basis to impose a vaccine mandate on students because New Jersey law requires universities to require certain vaccinations. Maj. Op. 40 (quoting JA 297 ("[E]ven if a university only requires students to be vaccinated, this has a rational basis. That is particularly true in New Jersey, which requires universities by law to impose vaccine mandates on students.")). But, even if true, that assertion does not satisfactorily address why Rutgers did not impose the COVID-19 vaccine mandate on faculty; rather, it argues only that imposing a vaccine requirement on students has its own rational basis. Consequently, that argument does not adequately describe the reason for the disparate treatment for groups of people who are both capable of contracting and transmitting COVID-19.

My colleagues also cite Rutgers's appellate briefing, in which it contended that its policy to exclude faculty from receiving the vaccine was consistent with New Jersey law. Maj. Op. 37-39, 37 n.39 (quoting Answering Br. 38 ("[E]ven [if] Rutgers continued to apply the Policy only to students, and not to employees, this would have been consistent with New Jersey law[.]")). But saying a policy is consistent with state law, after the policy was instituted, does not explain why the policy treated faculty and students differently in the first place.

18

Because we can look only at the reasons Rutgers gave for instituting the policy, Rutgers's after-the-fact characterization of its lawfulness under state law is beside the point and wholly inadequate.[14]

The second reason the Majority provides is that Rutgers's "adoption of the Policy for students before staff and faculty was also consistent with its stated priority for … the fall term to minimize outbreaks of COVID-19 among students, even before taking on the more ambitious goal of requiring employee vaccinations to protect the broader Rutgers University community." Maj. Op. 39-40 (cleaned up). According to the Majority, Rutgers was just following a sensible, "phased approach" to protecting its community, which "prioritized the health of the student body." Maj. Op. 4, 39-40. Unfortunately for Rutgers, however, it has never asserted that it had in mind a phased approach to vaccination. This argument is entirely my colleagues' invention. And the

---

[14] For the first time, at oral argument, counsel for Rutgers also explained that "the faculty were subject to collective bargaining … so there's a whole different circumstance with regard to faculty and staff because we have collective bargaining issues with them." Oral Arg. Tr. 43:12-16. In addition to that argument being forfeited by not being raised in the District Court, *Simko v. United States Steel Corp*, 992 F.3d 198, 205 (3d Cir. 2021), it is unpersuasive. Faculty with PhDs can be infected and infect others with COVID-19 in the same way as can first-year college students, and no reason was provided to explain what collective bargaining has to do with that and the consequent risks to the University community.

irony here is that the University's "phased approach," as the Majority would have it, was exactly backwards, at least if one accepts as wise what federal and state agencies were doing when implementing a "phased allocation" that provided vaccines first to older people and educators, rather than to students.[15] *See* Kathleen Dooling, MD et al., *The Advisory Committee on Immunization Practices' Updated Interim Recommendation for Allocation of COVID-19 Vaccine – United States, December 2020*, Centers for Disease Control and Prevention (Jan. 1, 2021), https://www.cdc.gov/mmwr/volumes/69/wr/mm695152e2.ht m [https://perma.cc/2X8G-YB3W] (recommending that frontline essential workers, including "those who work in the education sector (teachers and support staff members)" receive the vaccine prior to healthy young people). My colleagues rely

---

[15] The Majority appears to have developed its "phased approach" explanation by comparing Rutgers's initial COVID vaccination policy, issued in April 2021, with the updated version of that policy released in November 2021. As noted earlier, *supra* note 4, in the April policy, its stated purpose included to "minimize outbreaks of COVID-19 among students[.]" ECF No. 10-3 at 1. The November policy changed that purpose to include, "to minimize outbreaks of COVID-19 in the Rutgers University community[.]" JA 350. But the articulated purpose of both the April and November versions of the policy included "to prevent or reduce the risk of transmission of COVID-19 among *all persons* at Rutgers University and Rutgers–affiliated health care units; and to promote the public health of the community in a manner consistent with federal, State, and local efforts to stem" the pandemic. ECF No. 10-3 at 1; JA 350 (emphasis added).

on a remark by Rutgers's counsel when asked what in the operative complaint or associated documents established a rational basis for the vaccine mandate. He observed that students "live in dorms" and sit "shoulder to shoulder" in classrooms while professors in classrooms are approximately the same distance from students as a lawyer at the lectern is from judges on the bench.[16] Oral Arg. Tr. 43:22-44:1. Dormitory living, however, does not explain a university-wide student vaccination mandate, since a great many students do not live in dorms. Nor does the assumption – and it is a pure assumption with no record support – that students are more likely to contract COVID-19 from other students than from faculty.

---

[16] He did not get to this suggestion right away. He first responded that, "getting people vaccinated and getting back to normal was its own rational basis." Oral Arg. Tr. 41:21-23. That prompted the further question of why, then, it was rational to exclude faculty and staff. A colloquy followed, during which counsel said four things. First, he indicated there may have been a lack of regulatory authority to impose a mandate on faculty and staff, though he did not address how that squared with *Kovats*, nor did he articulate why there was no authority under state law. He then indulged in a non-sequitur by saying that the treatment of faculty and staff did not matter because they had not sued Rutgers. Next, when it was pointed out that the virus wasn't choosing to avoid some people because they had the title of professor, counsel responded with the further non-sequitur that faculty and staff are subject to collective bargaining (a point addressed *supra* note 14). He saved the "close quarters" suggestion for last.

21

My colleagues also say that Rutgers relied on *Harris v. University of Massachusetts, Lowell*, 557 F. Supp. 3d 304 (D. Mass. 2021), to argue that it had legitimate reasons to require vaccination for students but not for faculty. In that out-of-circuit case, the district court held that a university has a rational basis to impose a vaccine mandate on students, without it being imposed on faculty, because of, as the Majority quotes, "the higher transmission rate among young people, and the fact that it is the students who are congregating in close quarters on campus." Maj. Op. 40 (quoting *Harris,* 557 F. Supp. 3d at 313.). But Rutgers never relied on the reasons the Majority quotes from *Harris*. More to the point, there was no equal protection challenge in *Harris*. The district court there was tasked with determining whether the fact that university faculty were not required to be vaccinated undermined the plaintiffs' substantive due process claim. *Harris*, 557 F. Supp. 3d at 313. Thus, *Harris* is inapplicable to the argument at hand.

But there is still more wrong with using this "close quarters" argument to rule on the merits. It is irreconcilable with the position Rutgers took to justify its harsh treatment of Adriana Pinto, who Rutgers disenrolled from the single course she wished to attend for the Fall 2021 semester. Rutgers did so even though the professor in that course would have allowed her to attend remotely; even though Ms. Pinto executed a declaration swearing she would not set foot on campus that semester; and even though she was only a handful of credits away from graduating with her psychology degree, a degree that Rutgers does not offer though its online degree program. Rutgers took the position below – and reiterated it before us – that Ms. Pinto, being unvaccinated, will only be permitted to be a Rutgers student if she enrolls in an online degree program, with the consequence, of course, that she gives up her nearly

22

completed psychology degree. It was not enough that she would not need to be on campus and had promised not to go. And yet it was fine, by the University's lights, for any number of faculty and staff to be on campus irrespective of their vaccination status. The inconsistency is glaring. The Plaintiffs pointed this out, saying, "[t]here is no rational basis for requiring a student enrolled in remote classes and not physically present to vaccinate … when unvaccinated faculty and staff were permitted on campus freely when [Ms. Pinto] was deregistered." Opening Br. 20. There may be an answer to that argument, but, if there is, Rutgers has not offered it, nor is it readily apparent.

In the end, we don't really have to guess at the University's reasons; they are stated and have nothing to do with New Jersey state law treating students differently from faculty and staff or with Rutgers developing a "phased approach." The reason actually given was not confined to students or even to the campus itself. The stated concern from the very beginning was for "*all* persons at Rutgers University[,]" and the stated purpose was "to promote the public health of the *community*[.]" ECF No. 10-3 at 1 (emphasis added). Perhaps Rutgers will want to subscribe to the arguments that the Majority now hypothesizes for them. But we should put the onus on Rutgers to make and defend those positions. *See Sineneng-Smith*, 140 S. Ct. at 1579 (see parenthetical *supra*). That is how our adversarial litigation system is supposed to function, and we should accordingly remand for consideration of the University's own arguments.

### B.     The Substantive Due Process Claim

23

Lastly, I turn to the Plaintiffs' substantive due process claim. In support of it, the Plaintiffs have leveled a multi-prong assault on the vaccine mandate. First, they contend that they had a fundamental right to refuse vaccination and thus the mandate should be subject to strict scrutiny. Next, they contend that, if not strict scrutiny, we should apply some form of heightened scrutiny more stringent than rational basis review. Finally, they contend that Rutgers's justification of its vaccine mandate flunks even rational basis review. Specifically, they contend that, in addition to Rutgers's stated rationale, the University improperly sought to ingratiate itself with vaccine manufacturers. The Plaintiffs further argue that Rutgers's public health rationale is unsupported by science.

With respect to this claim, I am back in sync with much of my colleagues' analysis. The Plaintiffs' arguments are almost entirely without a serious legal basis. There is no doubt that "[v]accine mandates … fall squarely within a State's police power[.]" *Biden v. Missouri*, 595 U.S. 87, 104 (2022) (Thomas, J., dissenting) (citing *Zucht v. King*, 260 U.S. 174, 176 (1922)). So, as already discussed, rational basis review is in order. And I think it plain that Rutgers's vaccine mandate had a rational basis when it was first imposed. Moreover, vaccine mandates have often been imposed with rationales that are evergreen and so need not be constantly justified. The world is a vastly better place, for example, with polio held at bay.

The point I endeavor to make here with respect to the Plaintiffs' substantive due process claim is a modest one. It is simply this: because Rutgers chose to proffer a circumstance-specific justification for its vaccine mandate, it must live with the corollary that changed circumstances matter. Decision-

24

makers cannot pretend changed circumstances don't exist or are irrelevant.

This is not a novel principle. To the contrary, there are two long-standing maxims recognizing the effect of changed circumstances on the continued lawfulness of challenged conduct: *Cessante ratione legis cessat et ipsa lex* ("When the reason of the law ceases, the law itself also ceases") and *Ratio est legis anima, mutata legis ratione mutatur et lex* ("Reason is the soul of the law; when the reason of the law has been changed, the law is also changed"). *Legal Maxims*, *Black's Law Dictionary*, App. A (11th ed. 2019). Those maxims do not stand for the proposition that the overarching legal precept changes, or that the original precept is bad law, or that the subject conduct was unlawful ab initio. *See Rogers v. Tennessee*, 532 U.S. 451, 474-75 (2001) (Scalia, J., dissenting) (discussing the two maxims, which he identifies as going back at least to Lord Coke). Rather, changes in circumstances may require a different result than would have obtained had the changes not taken place. *See id.* at 474 (As to the first maxim, stating: "It had to do, not with a changing of the common-law rule, but with a change of circumstances that rendered the common-law rule no longer applicable to the case."); *id.* at 475 (As to the second maxim, explaining the non-extension of the common law rule in such a circumstance "involves no overruling, but nothing more than normal, case-by-case common-law adjudication.").

Rutgers has repeatedly pressed the notion in its briefing and at oral argument that its vaccine mandate simply reflects the dictates of governmental authorities, including public health officials. But Congress, the President, federal public health agencies, the New Jersey Legislature, the New Jersey

25

Governor, and the New Jersey Secretary of Health did not impose a vaccine mandate on Rutgers students. Rutgers did. The reality is that the University had the discretion not to do that, and its own justifications for its own actions are subject to challenge, albeit under a deferential standard.[17] Faced with the complaint in this case seeking prospective equitable relief that would prevent Rutgers from continuing its vaccine mandate, the University has to justify what it is continuing to do. It is not free to ignore the current state of the world, a point its own vaccine mandate policy expressly recognizes.[18]

---

[17] As is well-settled in the analogous APA context, however, a government official may have authority to take an action (at least in some circumstances) but nevertheless justify his action in a way that flunks even a very deferential standard of review. *See Dep't of Com.*, 139 S. Ct. at 2567, 2569 (holding that the Secretary of Commerce had the power "to inquire about citizenship on the census questionnaire[,]" but concluding the reasons he had given for doing so for the 2020 census – at the point the case came to the Supreme Court – were insufficient to survive the "narrow" and "deferential 'arbitrary and capricious' standard"); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905, 1912 (2020) (concluding that the Secretary of Homeland Security's explanation for rescinding the Deferred Action for Childhood Arrivals program did not pass muster even though "[a]ll parties agree" she had the power to rescind the program).

[18] Specifically, the policy states: "This policy is subject to change based on factors such as the progress of the COVID-19 pandemic and guidance from governmental authorities." JA 351.

26

The public health landscape has changed markedly since Rutgers imposed the mandate. As President Biden put it when rescinding Executive Order 14042, "[c]onsidering th[e] progress [made], and based on the latest guidance from our public health experts, we no longer need" the vaccine mandates that were earlier imposed on federal employees and contractors. Exec. Order No. 14099, 88 Fed. Reg. 30891 (May 15, 2023). Further, consistent with the President's "wind[ing] down certain remaining COVID-19 vaccination requirements to coincide with the May 11, 2023 termination of the federal public health emergency," New Jersey's Governor rescinded vaccine mandates applicable to various employees working in a broadly defined category of covered "health care settings."[19] N.J. Exec. Order No. 332 at 7-9. In taking that important step, the Governor likewise relied on the current state of COVID-19 infection and vaccination rates, nationally and in New Jersey. *Id.*

Rutgers argues that its vaccination mandate is "consistent with federal, State, and local efforts to stem the pandemic," JA 350, and that may have once been true. But in light of the aforementioned presidential and gubernatorial vaccine-mandate rescissions, the assertion that the continuation of the vaccine mandate for students at Rutgers is still consistent with federal, state, and local policies can be viewed with a strong dose of skepticism. Consequently, I

---

[19] The term was defined to include places ranging from "acute [and] pediatric … hospitals" to "specialty hospitals, and ambulatory surgical centers" to "long-term care facilities" and "dialysis centers" and facilities providing "[a]ll-inclusive [c]are for the [e]lderly." N.J. Exec. Order No. 332 at 10.

27

believe the Plaintiffs should be permitted to amend their complaint to test the rationality of leaving the mandate in place.

### III.    CONCLUSION

I concur in the Majority's judgment affirming the dismissal with prejudice of the Plaintiffs' federal preemption claim, ultra vires claim, and equal protection claim as it relates to natural immunity.  Additionally, I concur in my colleagues' reasoning that rational basis review applies to the Plaintiffs' constitutional claims.  I concur further in their conclusion that the Plaintiffs' equal protection claim relating to the faculty and staff is not moot.  I dissent as to their judgment to dismiss rather than to remand the matter to the District Court for further proceedings on the merits.  I would further permit the Plaintiffs to seek leave to amend their complaint to challenge the University's continued imposition of the vaccine mandate.